No. 95-2269

United States of America,         *
                                          *

     Appellee,               *
                                          *   Appeal from the United States
     v.                      *   District Court for the
                                          *   District of Nebraska.
Christopher G. White,        *
                                          *

     Appellant.              *

Submitted:  November 14, 1995

Filed:  April 18, 1996

Before BEAM, HEANEY, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

BEAM, Circuit Judge.

Christopher G. White (White) entered a conditional plea of guilty to conspiracy to distribute cocaine and possession with intent to distribute cocaine in violation of 21 U.S.C. § 846. White's plea was conditioned on his right to appeal the district court's[1] denial of his motion to suppress evidence discovered during a search of his vehicle. We affirm.

## I.  BACKGROUND

Shortly after 12:00 noon on June 16, 1993, White was driving his Lincoln Town Car eastbound on Interstate Highway 80 (I-80) when he overtook Lieutenant Steven Evans (Evans) of the Nebraska State Patrol. Evans, traveling in his unmarked cruiser at approximately sixty-five miles per hour, estimated that White was traveling

---

[1]The Honorable Thomas M. Shanahan, United States District Court Judge for the District of Nebraska.

seventy-five miles per hour, thereby exceeding the posted speed limit.

After passing Evans' cruiser, White returned to the right lane of eastbound I-80 without signaling his lane change. He then began weaving on the interstate, alternately driving on the right shoulder of the road and crossing the center line separating the two eastbound lanes of traffic. White's erratic driving pattern continued for several miles. Observing this behavior, Evans radioed Trooper Daniel Wilson (Wilson), another patrolman in the area. Evans described White's driving to Wilson, who caught up to White and began to follow White in his marked patrol car. Wilson also observed White's erratic driving. Concerned that White might be driving under the influence of alcohol or drugs, Wilson stopped the Town Car at about 12:20 p.m.

Wilson exited his patrol car and approached the driver's side of White's vehicle. Sergeant Roger Schmidt, who had been traveling with Wilson that day as an observer, stationed himself near the passenger side of White's car. Evans, who had pulled in behind Wilson's cruiser, remained in his own vehicle. Upon reaching White, Wilson requested White's driver's license and vehicle registration. White promptly produced his Virginia operator's license and a New York temporary registration. Because White's car bore Virginia license plates, Wilson asked White if he possessed a Virginia registration. White produced the Virginia registration, explaining that he had purchased the car in New York a few weeks earlier and had retained the in-transit registration.

While Wilson inspected White's license and registration, he asked White about his employment and destination. White told Wilson he was employed by a construction company in Virginia and was returning from a vacation in Las Vegas. Wilson advised White that he had stopped White for an improper lane change and for driving on the shoulder, and added that he was concerned White was

-2-

driving under the influence of alcohol or drugs.  White replied that he was merely tired, and explained that he was expected back at work in Richmond, Virginia, the following Monday and had had only five hours of sleep since he had left Las Vegas the previous day. Wilson found White's comments unusual, believing White should have no trouble making it back to Richmond since it was only Wednesday.  Although Wilson did not notice any signs of drug or alcohol impairment as he questioned White, Wilson found White's manner unusually nervous, noting White's shaking hands and rapid breathing. Wilson also noticed that the interior of White's vehicle smelled strongly of deodorizer, although he could see only one small deodorizer in the rear view mirror.

At the end of this exchange, Wilson decided to issue White a written warning for the traffic violations he had observed.  Wilson told White to remain in his car and returned to his cruiser to fill out the warning card and run a "wants and warrants" computer check on White.  The computer check revealed no irregularities, so Wilson returned to White, handed him his license and registration, and explained the warning ticket.  White thanked Wilson and said he would get some rest.  Wilson then asked to search the Town Car for drugs, weapons, large amounts of cash, alcohol, and illegal fireworks.

At this point, the parties offer different versions of the facts. Wilson testified at the hearing on White's motion to suppress that White consented to a search of his vehicle.  White testified that he advised Wilson the car did not contain contraband but did not consent to the search.  In any event, the parties agree that Wilson asked White to get out of the vehicle.  White exited and Wilson conducted a pat-down search of White, discovering a pager.  Wilson then introduced White to Sergeant Schmidt, who stood with White while Wilson and Trooper Evans, who had joined them, began to search the vehicle.  Trooper Wilson asked to gain access to the trunk of the car, and White walked to the front driver's

side door and entered a numeric code which opened the trunk. The search of the trunk revealed that the trunk carpeting was glued down unevenly and that a freshly-painted metal compartment was lodged directly underneath the trunk, indicating recent alterations to the vehicle. The trunk also contained several deodorizers. After discussing these observations, the troopers radioed for a police dog. The dog arrived at approximately 12:50 p.m. and promptly alerted to the odor of narcotics. White's car was then taken to a State Patrol office, where a warrant was obtained and a more thorough search revealed 112 pounds of cocaine.

White filed a motion to suppress the evidence seized pursuant to the search of his vehicle. Following an evidentiary hearing, a federal magistrate judge issued a Report and Recommendation to deny the motion. The district court adopted the magistrate judge's recommendations, and White now appeals. White argues that Trooper Wilson unjustifiably escalated the traffic stop into an investigative stop in violation of the Fourth Amendment to the United States Constitution.

## II. DISCUSSION

The district court held, and White concedes, that the initial stop of White's vehicle for traffic violations was lawful. White contends, however, that Wilson's questions during the stop were not, as our cases require, reasonably confined to the circumstances which justified the detention in the first instance. See United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991) (detention during lawful traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place). When Wilson asked White for permission to search for contraband, White argues, he escalated the traffic stop into an investigative stop which was unsupported by the requisite level of reasonable suspicion as defined in Terry v. Ohio, 392 U.S. 1 (1968). White further asserts that, assuming his

consent was given, it was not sufficiently voluntary to purge the taint of the unconstitutional <u>Terry</u> stop, and thus the fruits of the search must be suppressed.

We disagree with White's characterization of his encounter with Trooper Wilson. We have held that a reasonable investigation during a traffic stop "may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." <u>United States v. Ramos</u>, 42 F.3d 1160, 1163 (8th Cir. 1994), <u>cert. denied</u>, 115 S. Ct. 2015 (1995). A law enforcement officer may also run a computer check to establish whether the vehicle has been stolen and to ascertain whether there are outstanding arrest warrants for the occupants of the car. <u>See</u> <u>United States v. McManus</u>, 70 F.3d 990, 993 (8th Cir. 1995). Wilson efficiently carried out all of these procedures during his stop of White. After completing those tasks, Wilson returned to White, handed White his license and registration, and explained the warning ticket. Under the circumstances of this case, those actions ended the initial traffic stop. The events beyond that point, however, did not constitute a <u>Terry</u> stop as White contends. Instead, after White's license and registration were returned and the warning was issued, the encounter became nothing more than a consensual encounter between a private citizen and a law enforcement officer. <u>See</u> <u>United States v. Werking</u>, 915 F.2d 1404 (10th Cir. 1990) (traffic stop concluded and became consensual encounter when officer returned driver's license and registration).

## A. Consensual Encounters

It is well established that not all personal contacts between law enforcement officers and citizens constitute "seizures" for Fourth Amendment purposes. <u>Terry</u>, 392 U.S. at 19 n.16. A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to

search an area--even if the officer has no reason to suspect the individual is involved in criminal activity--provided the officer does not indicate that compliance with his request is required. <u>Florida v. Bostick</u>, 501 U.S. 429, 434-35 (1991). So long as a reasonable person would feel free "`to disregard the police and go about his business,'" the encounter is consensual and implicates no Fourth Amendment interest. <u>Id.</u> at 434 (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 628 (1991)). During such an encounter, the person approached "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." <u>Florida v. Royer</u>, 460 U.S. 491, 497-98 (1983) (plurality opinion).

Although there is no litmus test for determining when an encounter becomes a seizure, we have noted that circumstances indicative of a seizure may include "`the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" <u>United States v. Angell</u>, 11 F.3d 806, 809 (8th Cir. 1993) (quoting <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)), <u>cert. denied</u>, 114 S. Ct. 2747 (1994). The ultimate determination of whether a seizure occurred is a question of law which we consider de novo. <u>Id.</u>

The facts found by the district court, all of which are amply supported in the record, clearly demonstrate that White was no longer seized within the meaning of the Fourth Amendment after Wilson returned White's identification and issued a warning ticket. The district court found that Wilson displayed no weapons during the encounter, and that the tone of the entire exchange was cooperative. Although there were three officers present at the scene of the stop, the record indicates that Trooper Evans and Sergeant Schmidt were little more than passive observers prior to

commencement of the search. While it is true that Wilson did not tell White he was free to leave after he returned White's license and registration, it was White who prolonged the encounter beyond that time by telling Wilson he would get some rest. Moreover, at the time Wilson asked to search the vehicle White had everything he needed to lawfully proceed on his journey. See Royer, 460 U.S. at 501 (individual seized when officers retained his airline ticket and driver's license during questioning). Under these circumstances, we believe a reasonable person in White's position at the time Wilson asked for permission to search would feel free to terminate the encounter and be on his way. Thus, Wilson's request to search came during the course of a consensual encounter and was permissible with or without reasonable suspicion.[2]

---

[2]Contrary to White's assertions, our prior cases do not dictate a different conclusion. Indeed, the facts of this case are almost indistinguishable from those in United States v. White, 42 F.3d 457 (8th Cir. 1994). There, a patrolman stopped the driver of a rental truck for swerving on the interstate. Id. at 458. After questioning the driver, the patrolman issued a warning ticket, returned the driver's license and rental agreement, and told the driver he was free to go. Id. at 459. Immediately thereafter, the patrolman asked if he could search the driver's truck. The driver voluntarily consented. Id. at 459-60. On appeal, we declined to suppress the evidence found during the search of the truck. Noting that "a consensual search does not violate the Fourth Amendment if the consent was voluntarily given," we held that the search posed no constitutional problems. Id.

Although White believes his detention was similar to that found unconstitutional in United States v. Ramos, his reliance on Ramos is misplaced. In Ramos, an officer stopped two brothers for a violation of Iowa's seatbelt law. The officer requested that the driver sit in the patrol car as he ran a computer check, but allowed the passenger to remain in the vehicle. 42 F.2d at 1161-62. After completing the computer check, the officer kept the brothers separated and asked each of them additional questions about where they lived, their destination, their employment, and the contents of their vehicle. Id. at 1162. Only after pursuing these questions did the officer ask for permission to search the vehicle. We held that under the circumstances the additional questioning and delay constituted a Terry stop unsupported by reasonable suspicion. Id. at 1164.

This case involves none of the additional delay or further

-7-

## B. Voluntariness of Consent

Because Wilson's request to search White's vehicle involved no Fourth Amendment violation, the fruits of that search need not be suppressed so long as White voluntarily consented to the search. See, e.g., United States v. Miller, 20 F.3d 926, 930 (8th Cir.), cert. denied, 115 S. Ct. 226 (1994); United States v. Cortez, 935 F.2d 135 (8th Cir. 1991), cert. denied, 502 U.S. 1062 (1992).  It is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given. Miller, 20 F.3d at 930.  In determining whether the prosecution has met that burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given.  United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990).  We review the district court's assessment of voluntariness for clear error.  Id. at 380.

As noted earlier, Wilson and White offer different accounts of White's response to Wilson's request to search.  Wilson testified that upon asking permission to search the vehicle, White promptly consented.  White, on the other hand, testified that he did not give Wilson permission to search.  The district court credited Wilson's testimony, and nothing in the record has persuaded us that that finding is clearly erroneous.

The district court then analyzed the factors, enunciated in Chaidez, relevant to the voluntariness of White's consent.  The court found that the defendant was twenty-six years old and had completed an eleventh grade education.  It noted that White was not

---

questioning which created the Terry stop in Ramos.  Nor were there circumstances in this case, like the continued separation of the brothers in Ramos, which prevented White from terminating his encounter with Wilson after his identification was returned.  We therefore find Ramos clearly distinguishable from this case.

under the influence of drugs or alcohol when he was questioned, and that he had no apparent difficulty understanding Wilson's request to search the vehicle. The district court also observed that the encounter took place during daylight hours on the shoulder of the interstate after the defendant had been detained for only ten minutes. Although Wilson did not inform White he had the right to refuse to consent, the district court emphasized that nothing in the officer's manner indicated he was attempting to misrepresent White's rights in order to convince White to consent.[3] Further, and perhaps most significantly, the district court found that White's actions were consistent with a finding of voluntary consent. White made no objections to the search either before or after the search began, and even opened the trunk. Under these circumstances, the district court found that White voluntarily consented to the search of his vehicle. We have reviewed the record and have found nothing which suggests we should reverse the district court on this point. Accordingly, we conclude that the search of White's vehicle was constitutional and that the evidence seized pursuant to that search should not be suppressed.

## III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[3]The court also correctly noted that a law enforcement officer's failure to inform an individual of his right to refuse to consent does not preclude a finding of voluntariness. Schneckloth v. Bustamonte, 412 U.S. 218 (1973).

-9-